IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| THOMAS AMMONS, et al.,<br><br>                    Plaintiffs,<br><br><br>                vs.<br><br><br>LA-Z-BOY, INC.,<br><br>                    Defendant. | ORDER and MEMORANDUM<br>DECISION<br><br><br><br>Case No. 1:04-CV-67 TC |

The seven named Plaintiffs were employees of La-Z-Boy, Incorporated ("La-Z-Boy"), a furniture-manufacturing plant in Tremonton, Utah. All of the Plaintiffs were injured on the job and contend that because they filed or attempted to file worker's compensation claims, La-Z-Boy either forced them to quit or fired them as part of a larger scheme to reduce worker's compensation costs. The named Plaintiffs seek to represent a class of former La-Z-Boy employees who left work or were fired from La-Z-Boy within a year after filing or attempting to file worker's compensation claims. La-Z-Boy opposes class certification and seeks to sever the claims of the seven named Plaintiffs.

Plaintiffs bear the burden of showing that class certification is appropriate in this action. As discussed further below, they have not met this burden. Most significantly, Plaintiffs have not shown that issues of fact and law common to the putative class predominate over individual factual and legal questions. Rather, a rigorous analysis of the law and the record convinces the court that resolving the claims of each putative class member will require that the court inquire into his or her particular circumstances. Accordingly, Plaintiffs' motion for class certification is

DENIED.  Moreover, because the claims of each of the named Plaintiffs involve widely differing facts, La-Z-Boy's motion to sever is GRANTED.

## BACKGROUND

### La-Z-Boy's Tremonton Plant

Until recently, La-Z-Boy produced furniture in a plant located in Tremonton, Utah.  The La-Z-Boy human resources manager at the Tremonton plant was Thomas Smith.  Mr. Smith's job duties included supervising the plant's nursing staff, benefit managers and safety managers and monitoring La-Z-Boy's workplace injury program.  Mr. Smith reported to the plant manager. Marilyn Touchard, the safety manager, Lynda Saterfield, the plant nurse and Charles Acevedo, the plant's on-site physical therapist, were also involved in worker's health issues at the Tremonton plant.

Utah generally requires employers to provide worker's compensation insurance to their employees.  La-Z-Boy chose to insure itself and hired a third party administrator to handle its claims.  For most of the relevant time period, La-Z-Boy's claims administrator was Crawford & Company ("Crawford").  Kathleen Hobbs of Crawford handled most of La-Z-Boy's claims.  La-Z-Boy's worker's compensation plan doctor was Dr. Walker, who was generally the first doctor to see workers injured at the Tremonton plant.

### La-Z-Boy's Increasing Worker's Compensation Costs

According to Plaintiffs, worker's compensation claims at the La-Z-Boy Tremonton plant began to increase dramatically in 1998.  Aside from the additional money paid directly on claims, more claims meant that La-Z-Boy had to pay more for administration, more in security to the Utah Labor Commission and more in other regulatory fees.  Increased claims also meant more frequent federal health and safety inspections, some of which allegedly resulted in federal

fines against La-Z-Boy.  Plaintiffs claim that starting in late 1999 and early 2000, management at the Tremonton plant began a new campaign to reduce worker's compensation claims and related costs.

### Overview of La-Z-Boy's Alleged Wrongful Scheme to Reduce Costs

Plaintiffs contend that La-Z-Boy's new cost-cutting program included a strategy to eliminate workers who were injured on the job and filed or attempted to file worker's compensation claims.  Plaintiffs, relying on the affidavits of several such workers, identify four broad practices that La-Z-Boy adopted to achieve this goal.  First, La-Z-Boy attempted to discourage workers from filing claims by not providing information on worker's compensation claims.  Also, La-Z-Boy was hostile to workers who filed claims, gave injured workers demeaning tasks and even refusing to let employees file claims.  Second, La-Z-Boy worked with its third party administrator to deny claims and interfere with medical treatment, which prevented injured workers from recovering.  Next, La-Z-Boy made working conditions so intolerable for some injured workers that the workers were constructively discharged.  These conditions included forcing injured workers to come in to the plant while recovering from surgeries, establishing a 120-day-rule for injured workers to return to work, giving embarrassing and demeaning tasks to injured workers, assigning injured workers tasks that violated medical restrictions, and refusing to make the workplace safer.  Finally, Plaintiffs claim that many workers were fired for filing or attempting to file worker's compensation claims.  To carry out this part of the plan, Plaintiffs contend that La-Z-Boy created a "hit list" of injured employees who filed or would file worker's compensation claims and created bogus reasons to fire those employees.

### Summary of Named Plaintiffs' Affidavits

Each of the seven named Plaintiffs claim that he or she was wrongfully terminated, either by being fired or being forced to quit. The factual allegations made in each named Plaintiff's affidavit are summarized below.

### Thomas Ammons

Thomas Ammons worked as an upholsterer at La-Z-Boy from 1980 to October 2001. His job involved lifting and maneuvering heavy pieces of furniture. He first experienced pain in his shoulders in August 2000 and reported it to his supervisor, but his supervisor did not fill out worker's compensation forms on the injury. In February 2001, after other upholsters complained about shoulder pain, some improvements were made to improve work safety conditions in Mr. Ammon's work area. Those improvements were eliminated in July 2001.

In August 2001, Mr. Ammons notified two supervisors of increased pain in his shoulders. Both supervisors instructed him that he should not formally report his injuries until another injured worker in Mr. Ammons' work area returned to the plant after recovering from shoulder surgery. Also in August 2001, Mr. Ammons notified Ms. Touchard, the plant safety manager, that he was experiencing pain in his left knee and his right index finger. Mr. Ammons also told his immediate supervisor about the pain his in his knee. Mr. Ammons went to work in pain while he waited for the other worker to return. Mr. Ammons did not fill out worker's compensation forms during that time. According to Mr. Ammons, it was commonly understood that reporting injuries would reduce a worker's bonus and he also felt pressure to remain free from injury.

On October 27, 2001, Mr. Ammon's supervisor suspended Mr. Ammons for an outburst on his production line. Mr. Ammons denies any such outburst. A week after being suspended,

Mr. Smith, the human resources manager, fired Mr. Ammons.  Mr. Smith would not give a reason for the firing.  Mr. Ammons believes that management knew that he was going to file a worker's compensation claim the day he was terminated, and let him go for that reason.

Soon after being terminated, Mr. Ammons spoke to Ms. Touchard about worker's compensation paperwork.  Ms. Touchard told Mr. Ammons that he had 180 days to fill out the forms.  Mr. Ammons returned the completed forms to La-Z-Boy on about November 20, 2001, stating that he had injured himself on February 1, 2001.  After receiving the forms, Mr. Smith informed Mr. Ammons that the claim was rejected as being past the 180 day cut-off.  Mr. Ammons was surprised, because he felt that he was persistent in reporting his injuries but had been discouraged from filing a formal report before he was fired.

In December 2001, Mr. Smith instructed Mr. Ammons to see Dr. Walker.  Dr. Walker diagnosed Mr. Ammons with bone spurs in his shoulders and knee and trigger finger his in right hand.  Mr. Ammons then saw a specialist, who suggested surgeries to correct Mr. Ammons' injuries.  Though Ms. Hobbs of Crawford took Mr. Ammons' recorded statement in mid-December 2001, his claim was not accepted for payment.

In January 2002, Mr. Ammons filed a complaint with the Utah Labor Commission seeking payment on his worker's compensation claim.  In November 2002, La-Z-Boy deposed Mr. Ammons.  Within a week after the deposition, Mr. Ammons and La-Z-Boy began to discuss settlement of his state administrative complaint.  On December 12, 2002, Mr. Ammons settled that claim against La-Z-Boy.  The amount for which Mr. Ammons settled, however, did not cover the cost of the recommended surgeries.  Mr. Ammons has not been able to afford the surgeries and still suffers constant pain from his injuries.  He would like to reopen his worker's compensation file to allow for payment of his surgeries.

**Felix Barela**

Felix Barela began working at La-Z-Boy's Tremonton plant in 1979 and was terminated on August 23, 2000.  For the first fifteen years he worked at the plant, Mr. Barela was cutting wood with a hydraulic saw.  In about the mid-1990s, Mr. Barela was assigned to work as an assembler, which involved heavy lifting of furniture pieces at a fast rate.  He worked in that position for about five and a half years.

Mr. Barela's first reported on-the-job injury happened in April 1997.  At that time, he injured his back and went to the emergency room.  About a month later, Mr. Barela returned to work.  Mr. Barela next injured his back in May 1999.  A few weeks after that injury, he began to work on light duty.  ("Light duty" and "alternate duty" were names for assignments La-Z-Boy gave to workers who injured themselves and did not immediately return to their regular positions.)

Mr. Barela was next hurt in April 2000.  He immediately reported his injury to his supervisor, who sent Mr. Barela to Ms. Saterfield, the plant nurse.  Ms. Saterfield believed that Mr. Barela was not seriously injured.  Mr. Barela recalls Ms. Saterfield calling him a "baby" and comparing him to Frank Ross, another named Plaintiff who Ms. Saterfield believed was exaggerating his injuries.  After an hour in the nurse's station, Ms. Saterfield instructed Mr. Barela to return to work.

Mr. Barela went to work the next day, but was in great pain.  Ms. Saterfield then scheduled an appointment for Mr. Barela to see Dr. Schow.  The doctor concluded that Mr. Barela had injured his back, prescribed Mr. Barela medication and physical therapy and recommended that Mr. Barela work on light duty.  Dr. Schow also recommended an MRI, but Dr. Walker disagreed about the need for that test.  Mr. Barela was released to work his normal

duties in May 2000, but in June 2000 he experienced pain in his shoulder and back.  Dr. Walker prescribed medication and recommended work restrictions and a job change.  Mr. Barela had an MRI in July 2000 that showed herniated discs in his back.

Mr. Barela began working alternate duty in April 2000 and did so for all but a short period until August 2000.  La-Z-Boy violated all the work restrictions the doctors had recommended while he was on alternate duty.  Mr. Barela felt embarrassed by his alternate duty tasks, which included picking up cigarette butts.  While on alternate duty, Mr. Barela sought and was denied supervisor positions for which he believes he was qualified and which would not have violated his work restrictions.

Mr. Barela was fired in August 2000.  Mr. Smith told Mr. Barela that he was being terminated for falsifying time cards.  Mr. Barela denied this claim and argued that because he was being paid a flat rate, time cards were irrelevant in any case.  After he was terminated, Mr. Barela was denied unemployment benefits, but appealed that denial and started to receive benefits after it was determined that he was fired for no cause.

After his termination, La-Z-Boy was still involved with Mr. Barela's treatment.  Ms. Hobbs sent Mr. Barela to several doctors for diagnosis and treatment.  Mr. Barela underwent an unsuccessful back surgery in November 2000.  Following that, doctors tried several other treatments, none of which helped Mr. Barela's severe back pain.  Eventually, a second surgery was recommended, but his worker's compensation claim was denied by La-Z-Boy.  Mr. Barela received temporary total disability payments until May 2001, but after that point, La-Z-Boy declared him fit for work and stopped the payments.  Mr. Barela would like his worker's compensation claim reviewed.

**Oscar Garcia**

Oscar Garcia began to work in the Tremonton plant in 1985.  During most of his time at La-Z-Boy, he worked in the paint booth, which involved lifting and handling heavy furniture. Mr. Garcia experienced various injuries at the plant in his first years there, including a hernia, an elbow injury, and trauma to his teeth.  In October 1998, Mr. Garcia hurt his wrists when he fell from a machine.  He reported this injury to Ms. Saterfield the day it happened.

Ms. Saterfield did not fill out an accident report on Mr. Garcia's injury, instead saying that she had to speak to Mr. Smith first.  Mr. Garcia continued to work in pain until about a week later, when he saw a doctor.  The doctor took x-rays and suggested surgery.  La-Z-Boy did not approve the surgery at that time and Mr. Garcia worked at his regular duty which involved heavy lifting.

After the initial visit to a doctor, Mr. Garcia requested that La-Z-Boy allow him to see his own doctor, but La-Z-Boy insisted he see Dr. St. Onge.  Dr. St. Onge diagnosed a torn ligament in Mr. Garcia's right wrist and suggested surgery.  Mr. Garcia had surgery on his wrist in late March 1999.  Mr. Garcia then suffered various complications from the operation, requiring further treatment.  Because of the serious nature of the complications and treatments, Mr. Garcia was not able to go back to work until September 1999.  When he went back to the plant, he was transferred to another job.  La-Z-Boy also had Mr. Garcia's level of impairment assessed at around that time and Crawford later informed him that he had a 4% disability rating.

Not long after he began working, Mr. Garcia's left wrist began to hurt.  He was approved to see his personal doctor in October 1999.  In November 1999, Dr. St. Onge suggested work limitations for Mr. Garcia and tests for his left wrist.  Because La-Z-Boy delayed, the tests were not completed until January 2000.  Dr. St. Onge diagnosed carpal tunnel syndrome and

recommended surgery on Mr. Garcia's wrist.

Mr. Garcia requested that worker's compensation pay for the surgery, but Crawford rejected the claim.  Crawford and La-Z-Boy denied that Mr. Garcia had injured himself as a result of an accident, attributing it instead to repetitive motion.  La-Z-Boy also claimed that Mr. Garcia's wrist pain stemmed from an accident he had as a young boy.  La-Z-Boy told Mr. Garcia that he would have to have his personal health insurance cover the cost of the procedure.

Mr. Garcia again injured his wrists while working at La-Z-Boy in November 2001.  He saw Dr. Schow, who cleared Mr. Garcia to return to work almost immediately, though Mr. Garcia was in a splint.

During much of his final year at the Tremonton plant, Mr. Garcia was on alternate duty.  Although he was not supposed to use his hands, his assignments required him to use his hands extensively.  Several of the tasks he performed aggravated his injuries.  Ms. Saterfield was convinced that he was faking his injuries, and was rude to him.  Because Ms. Saterfield started writing down everything he asked for from the nurse's station, Mr. Garcia was hesitant to ask her for bandages to cover the cuts on his hands that he suffered from working with injured wrists.

Mr. Smith fired Mr. Garcia on September 23, 2002, alleging that Mr. Garcia had falsified time cards.  Mr. Garcia denies doing so and believes that he was fired for filing worker's compensation claims.  He would like his worker's compensation case reopened.

### Dennis Nelson

Dennis Nelson worked as an upholsterer at the Tremonton plant from 1987 to January 2003, with a few months away between 1997 and 1998.  His job involved heavy lifting.  In the 1990s, Mr. Nelson developed carpal tunnel syndrome in his hands and had surgery to correct it.  In 1999, Mr. Nelson developed bursitis in his shoulders, filling out worker's compensation

paperwork when the pain began.  After reporting his pain, Mr. Nelson began to see the physical therapist, received pain shots and for a time was on light duty.  He was also told that there were plans to improve the safety of his job, but he says no such measures were put in place.  Mr. Nelson did not receive any payments related to his shoulder condition.

In Spring 2001, Mr. Nelson injured his right thumb at work.  Because he had heard that La-Z-Boy mistreated other workers who filed worker's compensation claims, he did not immediately file a worker's compensation claim, instead working through the pain.  About six months after injuring his thumb, Mr. Nelson filed out worker's compensation paperwork.  Mr. Nelson initially saw Dr. Walker.  Dr. Walker referred Mr. Nelson to Dr. Larson, who said that Mr. Nelson had sprained a muscle.  Mr. Nelson believed that his injury was more serious, so he obtained a second opinion from Dr. Esplin.  Dr. Esplin agreed that the problem was severe, and recommended ligament reconstructive surgery.  Mr. Nelson had the surgery performed in October 2001.

Mr. Nelson had to return to the plant the day after his surgery.  Ms. Touchard told him that injured workers had to go to the plant for at least an hour so that La-Z-Boy did not have to report a lost time accident.  At some point, Mr. Nelson was placed on light duty, with the restriction that he could only work with one hand.  Mr. Nelson was nonetheless given several duties that required two hands, such as rolling up head rests and picking up trash.  Mr. Nelson heard rumors that light duty was made as undesirable as possible to discourage workers from faking injuries.  Eventually, Mr. Nelson was cleared to return to his regular job with no work restrictions.

In November 2002, however, Mr. Nelson began to feel pain in his thumb again and reported it to La-Z-Boy and Crawford.  Mr. Nelson was placed on light duty.  Before he saw a

doctor, Mr. Smith told Mr. Nelson that Mr. Nelson could not return to his upholstery job because of his injuries.  Mr. Nelson's new doctor suggested a second surgery on his thumb, and Crawford approved payment for the surgery.  The surgery was performed in December 2002.  As with the previous surgery, Mr. Nelson was required to return to work for an hour a day immediately after leaving the hospital.

Mr. Nelson was again placed on light duty, where he was assigned to tear perforations from time cards.  This job caused him pain, which he reported to his doctor.  In January 2003, his doctor told him that if his light duty included tearing time cards, he should limit his work to an hour a day.  His doctor left a blank space on a work release form and told him to write in "one hour" as the recommended time limit unless he was offered a different job.  Since Mr. Nelson was given the same task, he filled in "one hour" on his release. Mr. Smith then suspended Mr. Nelson for falsifying medical records.  Mr. Nelson explained that his doctor had instructed him to fill in the blank, but Mr. Smith did not reverse his decision.

Mr. Nelson then got a new release from his doctor in which the doctor filled out the one-hour time restriction.  Mr. Nelson was nonetheless terminated for falsifying medical records.  Even after being fired, Mr. Nelson went for physical therapy at the Tremonton plant.

In July 2003, Mr. Nelson's doctor gave him a 7% whole person disability rating.  La-Z-Boy got a second opinion, which rated the disability at 3 or 4%.  La-Z-boy paid Mr. Nelson's disability at the lower rate.  Mr. Nelson has suffered additional injuries and pain since leaving La-Z-Boy, which he attributes to working at La-Z-Boy.  La-Z-Boy has not paid for any treatment since he was fired.  Mr. Nelson would like to reopen his worker's compensation case.

**<u>Wade Peterson</u>**

Wade Paterson worked at the Tremonton plant between 1985 and July 8, 2002.  He held

various jobs while at La-Z-Boy, most of which involved heavy lifting.  On February 1, 2004, he

injured his right arm at work.  He reported the injury three days later and filled out the worker's

compensation forms at that time.  After he reported his injury, Mr. Peterson was placed on light

duty, which included putting washers and nuts on screws and picking up trash in the plant's

parking lot.  Mr. Peterson believed that light duty assignments were embarrassing.  He recalls a

supervisor telling him that light duty was designed to be uncomfortable to encourage injured

workers to resume their regular duties sooner.  Mr. Peterson also remembers hearing plant nurses

pressing Dr. Walker to lift work restrictions placed on injured workers, which Mr. Peterson

believed was uncomfortable for the nurses.

The day after reporting his injury, Mr. Peterson saw Dr. Walker, who referred him for

tests on his right shoulder.  Mr. Peterson had torn his rotator cuff and a tendon in his right arm.

He had surgery for those injuries on March 7, 2002.

In May 2002, Mr. Peterson began to work again, and on June 1, 2002, he injured his left

arm.  The same day, he filled out a worker's compensation claim, and saw a doctor a few days

later.  The doctor recommended an MRI and said surgery was likely needed.  Mr. Peterson

believes that La-Z-Boy deliberately delayed approving the MRI suggested by the doctor.

On June 27, 2002, while waiting for authorization for the MRI, Mr. Peterson was

informed by Mr. Smith that because Mr Peterson was facing surgery and physical therapy, La-Z-

Boy was going to terminate him.  Mr. Peterson was not offered a new job, but was told that he

could work light duty until July 8, 2002.  Mr. Peterson saw a second doctor about his left arm on

July 18, 2002, and had surgery on his arm on August 22, 2002.

In early 2003, Mr. Peterson was given disability ratings on his shoulders, and La-Z-Boy

paid Mr. Peterson $15,000.  After that, La-Z-Boy refused to pay for any further treatment for Mr.

Peterson.  Mr. Peterson appealed La-Z-Boy's refusal to the Utah Labor Commission, but dropped his appeal because he did not want to deal with the stress of litigation.  He would like his worker's compensation case reopened.

Mr. Peterson has not worked since being fired.  He reports being depressed, losing his house, and being divorced.

**Frank Ross**

Frank Ross began working at the Tremonton plant in 1983.  For most of his time at the plant, Mr. Ross worked as an upholsterer.  His job involved frequent lifting of heavy chairs.  Mr. Ross first injured his lower back in 1989 and had further back injuries in the 1990s.  In about June 1996, Mr. Ross developed pain in his left shoulder.  He received treatment and eventually went back to work.

In Summer 1999, Mr. Ross injured his right shoulder and lower back.  His injuries were caused by repetitive motion and he noticed other upholsterers with similar injuries.  Mr. Ross reported pain in his arm to his supervisor, but his supervisor did not fill out or direct Mr. Ross to fill out worker's compensation forms.  Mr. Ross continued to complain of pain and about three weeks after his initial report, Mr. Ross' supervisor told Mr. Ross to fill out a report.  Mr. Ross filed the worker's compensation claim for his right should and back injuries.  His claims were initially denied, and while he waited for treatment he continued his normal duties.

In Fall 1999, Ms. Saterfield sent Mr. Ross to see Dr. Walker.  Dr. Walker gave Mr. Ross permanent work restrictions and limited the use of his shoulder.  Mr. Ross then saw a surgeon, Dr. Larson, who suggested surgery for his right shoulder.  Despite the recommendation, Dr. Larson gave Mr. Ross cortisone injections and suggested physical therapy. Dr. Larson said that La-Z-Boy would not approve the surgery until those treatments were administered, though Dr.

Larson did not think they would be effective.

After Dr. Larson's recommendation for surgery, La-Z-Boy requested a second opinion from Dr. Morgan. Dr. Morgan, not a surgeon, disagreed that surgery was needed. Nonetheless, Mr. Ross received approval for the surgery. However, on several occasions, after Mr. Ross scheduled the surgery, the hospital called to tell Mr. Ross that La-Z-Boy had cancelled it. Ms. Touchard told Mr. Ross that Mr. Smith had cancelled those dates. In March 2000, Mr. Ross received surgery on his shoulder. Mr. Ross believes he suffered nerve damage in his arm as a result of the delay in the surgery.

Mr. Ross attended physical therapy and performed light duty after his surgery. In July 2000, Mr. Ross again injured his right should while picking up trash on light duty. It was agreed that another surgery on his shoulder was needed and Mr. Ross had another surgery for his shoulder in August 2000.

The day after his surgery, Mr. Ross was required to report to La-Z-Boy for an hour. He drove to work on pain medications and with his right arm in a sling. He continued to drive to work for an hour a day, initially just sitting in the physical therapy unit. For the year or so after his surgery, Mr. Ross was on alternate duty. He was given degrading and unproductive assignments despite productive jobs being available. He was paid $8 an hour to work as a line loader, which usually pays over $23 an hour. He was also given jobs that violated his medical restrictions, including handling and cutting heavy racks.

On one occasion, Ms. Saterfield moved Mr. Ross from a work-flow coordinator position to picking up trash. Mr. Ross informed Mr. Smith and Ms. Saterfield that picking up trash violated his work restrictions. After three hours of this work, Mr. Ross was in pain and had to receive treatment for his back. Mr. Smith then ordered Mr. Ross back to picking up trash.

14

The workers on alternate duty had a meeting with Mr. Smith, Ms. Saterfield and others where the workers informed management that picking up garbage felt like a punishment. Nonetheless, Mr. Ross was on garbage pick-up duty for the next three months. While he was picking up garbage, many co-workers told Mr. Ross that they would not report physical limitations because they saw Mr. Ross being treated so poorly. Mr. Ross' back injury worsened while picking up trash.

Mr. Ross did not regain full use of his arm. Nonetheless, in about February 2001, he stopped receiving worker's compensation checks. Mr. Ross asked Mr. Smith why this was so and Mr. Smith explained that Mr. Ross had reached "maximum medical improvement." Mr. Ross did not know that anyone had made that determination. He was later paid $16,990 from worker's compensation for a 16% whole body impairment rating.

In August 2001, Mr. Ross took what he believed was a temporary assignment as a trainer on the night shift. After five weeks on the night shift, he asked to return to the day shift. He was not allowed to bid for any job but night shift trainer. In October 2001, Mr. Ross bid for the line loader job he had done on alternate duty. Mr. Acevedo and Ms. Touchard agreed that Mr. Ross could physically perform the duties for that position. Mr. Ross was turned down for what he believes were bogus reasons. A supervisor and Mr. Smith then told Mr. Ross he would never be allowed to have another job except night shift trainer despite Mr. Ross' seniority.

During the last week Mr. Ross worked the night shift, two less senior workers received transfers to the day shift. Mr. Ross then asked Mr. Smith to transfer to the day shift to have more time with his family. Mr. Smith reiterated that Mr. Ross would always work the night shift as long as he worked at La-Z-Boy. Mr. Ross felt that his family relationships were suffering due to his working the night shift. He also felt that after over eighteen years at La-Z-Boy, he should be

15

able to bid on open day shift positions.  He resigned on October 24, 2001.  Mr. Ross'

replacement was placed on day shifts two weeks after Mr. Ross resigned.

Mr. Ross believes that he was on a "hit list" of employees that La-Z-Boy wanted to fire.

He also believes that he was forced out by La-Z-Boy because it wanted to save on worker's

compensation costs.

### Heidi Scott

Heidi Scott worked at La-Z-Boy from September 1999 to January 2001.  She initially

worked as an upholsterer, but then moved to work as a line loader.  This position involved heavy

lifting.  On August 31, 2000, Ms. Scott was picking up a piece of furniture and heard pops in her

back.  That same day, Ms. Scott filled out worker's compensation paperwork.

While Ms. Scott felt fine the day of her injury, she collapsed before going to work the

next day.  She went to see Dr. Walker, who sent her to the hospital for x-rays.  Dr. Walker did

not clearly see an injury in the x-rays, so he suggested Ms. Scott undergo physical therapy.  Ms.

Scott was in too much pain to go on light duty, so she went to physical therapy every day instead.

The pain in her back, however, continued to worsen.

Ms. Scott's back did not improve, so Dr. Walker sent her to a back specialist, Dr. Fogg.

Dr. Fogg recommended water exercises for Ms. Scott's back, which she paid for.  Though her

back did not improve, Ms. Scott asked Dr. Fogg to release her to light duty for fear of being

fired.  Dr. Fogg also gave her a disability rating of 6% whole body impairment.

Mr. Scott believes that La-Z-Boy management purposely tried to get rid of her.  Mr.

Acevedo told her that he was lobbying management to keep her and that if La-Z-Boy paid her

disability she would be out soon after.  Ms. Saterfield often told Ms. Scott that she was faking

her back injury and that she was lazy.  Ms. Scott believes that meetings were held where

management came up with ways to drive out injured employees.

Ms. Scott sought a job in the sewing department, which Ms. Touchard and Mr. Acevedo suggested would be appropriate for her, but La-Z-Boy refused her request. On January 3, 2001, La-Z-Boy paid her about $6,600 for her disability rating.  On January 4, 2001, Mr. Smith fired Ms. Scott, saying that La-Z-Boy no longer had a position for her.

After being fired, Ms. Scott's back pain increased.  In February, 2001, Dr. Fogg suggested surgery.  La-Z-Boy instructed Ms. Scott to get a second opinion  and she saw Dr. Morgan, who said that there was nothing wrong with her.  Based on that opinion, La-Z-Boy has since refused to pay for surgery or other back treatment.  In May 2001 Ms. Scott had back surgery which was paid for by Medicaid.  She says she would like to have her worker's compensation claim reopened.[1]

### La-Z-Boy's Response

La-Z-Boy does not dispute every factual allegation made in the factual affidavits.  Rather, La-Z-Boy denies that it had a pattern or practice of firing or constructively discharging injured workers and gives legitimate reasons for many of the practices that Plaintiff alleges were designed to force out injured workers.  For example, La-Z-Boy argues that many of its policies regarding injured workers came directly from suggestions by the Utah Labor Commission. These practices included consulting with Crawford, working with treating physicians, and encouraging inured employees to return to work quickly.  La-Z-Boy further asserts that it took many steps to try to improve workers' health and safety at the Tremonton plant, such as encouraging early reporting of injuries and establishing an onsite physical therapy program.

---

[1] Although other employees and former employees submitted affidavits, the court will not summarize them but will refer to them when necessary to explain this Order.

Overall, La-Z-Boy asserts that its incentive to rehabilitate and retain injured workers was greater than any savings it would have gained by purposely driving out those workers.

**Procedural History**

The named Plaintiffs brought an action against La-Z-Boy in Utah state court in about April 2004, seeking to represent a class similar to that proposed here. La-Z-Boy removed the lawsuit to this court in May 2004. Once here, La-Z-Boy moved to sever and for a judgment on the pleadings. Because the judgment on the pleadings involved issues of unresolved Utah state law, the court certified several questions to the Utah Supreme Court and the case was stayed. Of particular relevance here, the State Court was asked whether Utah recognizes a cause of action for wrongful termination for filing worker's compensation claims and, if so, whether a constructive discharge would be considered a termination for purposes of such a claim. In late November 2006, the Court responded, answering "yes" to both questions. See Touchard v. La-Z-Boy, Inc., 148 P.3d 945, 948-55 (Utah 2006).

La-Z-Boy again moved to sever and Plaintiffs moved to amend their complaint. On November 20, 2007, Plaintiffs filed their First Amended Complaint. In the First Amended Complaint, Plaintiffs asserted one cause of action: wrongful termination in violation of public policy. The primary remedies requested by the First Amended Complaint were money damages, compensatory damages, punitive damages and "injunctive relief preventing La-Z-Boy from engaging in further conduct in violation of Utah public policy." (Dkt. No. 108, First Amended Complaint, Prayer for Relief ¶ 7.) Plaintiffs also alleged that class certification is appropriate.

After Plaintiffs filed the First Amended Complaint, the parties engaged in discovery specifically related to the issue of class certification. On April 15, 2008, the Plaintiffs made the present motion for class certification and La-Z-Boy once again moved to sever.

18

Also on April 15, 2008, Plaintiffs submitted a Second Amended Complaint.  Like the First Amended Complaint, the Second Amended Complaint asserts a single wrongful termination cause of action and alleges that a class should be certified.  The most significant change in the Second Amended Complaint is in the relief it seeks.  The First Amended Complaint's request for compensatory relief has been taken out entirely and the request for injunctive relief has been changed.  In the Second Amended Complaint, the injunction requested is an order requiring "the Labor Commission to review and/or reopen the workers' compensation claims of the named Plaintiffs and the putative class members."  (Dkt. No. 198, Second Amended Complaint, Prayer for Relief ¶ 2.)  Also, the Second Amended Complaint's request for money damages has been amended to specifically refer to "back pay and lost benefits."  Plaintiffs have not formally sought leave to file the Second Amended Complaint, though La-Z-Boy has not objected to its submission or filing.

Following the Plaintiffs' motion to certify the class, the parties have made several motions relating to evidentiary submissions made in support or in opposition to class certification.  A hearing was initially set on all of the outstanding motions, but the court cancelled that hearing, having determined that it could effectively decide the issues on the briefs.  The court will address and resolve all outstanding motions in this Order.

## ANALYSIS

## I.   Evidentiary Motions Related to Class Certification

La-Z-Boy and Plaintiffs have moved to strike various parts of the record created by the opposing side in their briefing concerning class certification.  Because granting these motions could affect the analysis of the class certification issue, the court will resolve these motions first.

### A.       La-Z-Boy's Motion to Strike Lay Witness Declarations

In support of their motion to certify a class, Plaintiffs submitted twenty-nine factual affidavits.  La-Z-Boy contends that there are numerous evidentiary flaws in these affidavits and moves the court to strike the affidavits or ignore the challenged sections.

The court will do neither.  The Tenth Circuit has not yet ruled on the issue of whether the Federal Rules of Evidence apply to class certification proceedings and the court was not able to locate other federal circuit opinions on the question for guidance.  Several federal district courts, however, have directly addressed the issue.   Every decision the court located has ruled that evidentiary rules need not be strictly applied at the class certification stage.  See, e.g., Carrier v. American Bankers Life Assur. Co. of Fla., Civ. No. 5-CV-430- JD, 2008 WL 312657, *3 (D.N.H. Feb. 1, 2008) (". . . the rules of evidence do not strictly apply for purposes of determining class certification. . ."); Bell v. Addus Healthcare, Inc., No. C06-5188RJB, 2007 WL 3012507, *2 (W.D. Wash. Oct. 12, 2007) ("Thus, Fed. R. Civ. Pro. 23 does not require admissible evidence in support of a motion for class certification and the Court will not create that standard."); and Tedrow v. Cowles, No. 2:06-CV-637, 2007 WL 2688276, *2 (S.D. Ohio Sept. 12, 2007) (Federal Rules of Evidence do not apply at class certification).  The court finds these decisions to be well-reasoned.  Accordingly, the court will not strike the fact affidavits, regardless of whether they comply with the Federal Rules of Evidence.  Instead, the court will review these affidavits in considering the factual issues involved in the Plaintiffs' allegations specific to whether a class may be certified.

When considering these affidavits, however, the court does not necessarily take all of their factual assertions as true.  Nor are all of their assertions given equal weight.  Instead, the court gives each factual statement the evidentiary value the court views as appropriate.  So, for

example, statements that are obvious hearsay receive little or no consideration while undisputed statements from personal knowledge are given a good deal of weight.

>    **B.**    **La-Z-Boy's Motion to Strike Expert Declarations**

Plaintiffs submit two expert declarations in support of their motion for class certification. One expert, Olie Jolstad, submitted a declaration opining on La-Z-Boy's lack of compliance with Utah worker's compensation law, custom and practice. The second expert, J. David Mason, submitted statistical analyses relating to injured workers at La-Z-Boy. In support of its motion to strike these declarations, La-Z-Boy argues that the expert declarations do not meet the requirements of Rule 702 of the Federal Rules of Evidence.

The Tenth Circuit has not addressed the questions of how or when to exclude expert opinions in class certification proceedings. The question is not an easy or entirely settled one. As pointed out by La-Z-Boy, the court must undertake a rigorous analysis, which suggests that Rule 702 applies. On the other hand, Rule 702 is primarily designed to keep unreliable expert testimony from juries, and expert declarations in connection with class certification are offered solely for the court's benefit.

The court views the decision of whether to apply Rule 702 to expert opinions in considering whether to certify a class as one left to the discretion of the district court. See, e.g., Rhodes v. E.I. du Pont de Nemours and Co., Civil Action No. 6:06-cv-00530, 2008 WL 2400944, *11 (S.D. W. Va. June 11, 2008), ("Neither the Federal Rules of Evidence nor the Rules of Civil Procedure prohibit use of Daubert [v. Merrell Dow Pharms. Inc., 509 U.S. 579 (1993)] at the class certification stage and Rule 23 does not specifically provide for, require, or prohibit specific proceedings.") In this case, the court is persuaded by the conclusion of the federal district court in Dukes v. Wal-Mart, Inc., 222 F.R.D. 189, 191 (N.D. Cal. 2004), which

concluded that rather than determining whether expert evidence meets the requirements of Rule 702, "the question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met."  For this reason, the court will not strike the expert submissions, but will instead consider them for whatever probative value they might have.

C.     **Plaintiffs' Motion to Strike Certain Statements in La-Z-Boy's Opposition**

Plaintiffs identify several factual assertions made by La-Z-Boy in its opposition to class certification that Plaintiffs assert are based on information La-Z-Boy did not previously produce to Plaintiffs.  Plaintiffs seek to have these assertions stricken.  La-Z-Boy responds that it did not produce the underlying information to Plaintiffs because Plaintiffs did not request that information.

As is clear from the court's discussion on La-Z-Boy's motions to exclude evidence, courts have wide discretion in what they may consider at class certification.  Plaintiffs provide no authority for excluding evidence at class certification because the proponent did not previously produce it to the opposing party.  Instead, Plaintiffs point to cases involving other types of motions, which do not control in this setting.  Accordingly, the court will exercise its discretion and consider the factual assertions made by La-Z-Boy, in each instance giving the assertion only the weight the court believes is due.[2]

II.    **Requirements for Certification of a Class Under Rule 23**

Plaintiffs seek to have the following class certified:

All La-Z-Boy employees at the Tremonton, Utah plant (excluding all management employees with authority over worker's compensation decisions and/or decision

---

[2] La-Z-Boy also moved to supplement the record with Plaintiffs' analysis of the value of the named Plaintiffs' claims.  Plaintiffs have not opposed that motion.

to hire transfer, discipline, and/or terminate employees) who were injured on the job, and whose employment was severed (1) between April 2000 and the present and (2) within one year of exercising or attempting to exercise their rights under the Utah Workers' Compensation Act.

(Pls.' Mem. in Supp. of Class Cert. at 4-5.)  All of the named Plaintiffs meet this class definition.

While Plaintiffs bear the burden of proving that the suit should proceed as a class action under Federal Rule of Civil Procedure 23, the court "must engage in its own 'rigorous analysis' of whether the prerequisites" of Rule 23 have been satisfied. Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004) (citation omitted) (Shook I").  In undertaking this analysis, the "court must accept the substantive allegations of the complaint as true, although it 'need not blindly rely on conclusory allegations which parrot Rule 23.'" Shook I, 386 F.3d at 968 (citations omitted). Moreover, although the court should not decide the merits of a plaintiff's claims at the class certification stage, there "is not an impermeable wall between the substance of a cause of action and the decision to certify the class."  Shook v. Board of County Comm'rs of the County. of El Paso, 543 F.3d 597, 612 (10th Cir. 2008) ("Shook II").  Accordingly, a court should consider the factual and legal issues presented by a plaintiff's complaint to the extent that those issues have a bearing on whether to certify a class.  See Shook I, 386 F.3d at 986.

 "Rule 23(a) requires an analysis of four elements which are preconditions to class certification: numerosity, commonality, typicality, and adequacy of the named parties to represent the class."  Shook I, 386 F.3d at 968.  "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988)).  If all of Rule 23(a)'s requirements are satisfied, "[t]he court must then look to the category of class action under Rule 23(b) for additional prerequisites involving certification of a class." Shook I, 386 F.3d at 968.  Plaintiffs seek certification under Rule 23(b)(2), sometimes

called an injunctive class, or, in the alternative, under Rule 23(b)(3), sometimes called a damages class.

## III.   Requirements of Rule 23(a)

### A.   Numerosity

The numerosity criterion requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a).  The Tenth Circuit has no presumption that any particular number of class members constitutes a threshold number above which numerosity is presumed.  See Trevizo, 455 F.3d at 1162.  Instead, "because it is such a fact-specific inquiry, we grant wide latitude to the district court in making this determination." Id.

Here, Plaintiffs contend that at least two hundred people meet their proposed class definition. La-Z-Boy does not contest this number.  Instead, La-Z-Boy disputes the legal merits of the definition.  The reasoning behind those arguments will be addressed in other sections of this Order.  Because two hundred is clearly a large enough number of claimants to make joinder impracticable, the court finds that the putative class meets the numerosity requirement.

### B.   Commonality

The commonality criterion requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To meet this prong, a court considers whether  members of the putative class "possess the same interest and suffer the same injury." Trevizo, 455 F.3d 1155, 1163 (10th Cir. 2006) (quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982)).  Factual differences among the putative class members' claims do not preclude a finding of commonality: only a single issue needs to be common and common issues need not predominate.  See J.B.v. Valdez, 186 F.3d 1280, 1288 (10th Cir. 1988).

In light of these standards, Plaintiffs' proposed class meets the commonality requirement.

Every worker has right to seek worker's compensation benefits and the alleged injury to each

putative class member was that La-Z-Boy wrongfully discharged him or her for applying or

attempting to apply for those benefits.

### C.    Typicality

Typicality requires that  the "claims or defenses of the representative parties are typical of

the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

> Typicality does not require that the claims of class members be identical to the claims of
> the class plaintiffs. "[D]iffering fact situations of class members do not defeat typicality
> . . . so long as the claims of the class representative and class members are based on the
> same legal or remedial theory."

J.B., 186 F.3d at 1299 (Briscoe, J. concurring in part and dissenting in part) (citing Anderson v.

City of Albuquerque, 690 F.2d 796, 800 (10th Cir. 1982), quoting Adamson v. Bowen, 855 F.2d

668, 675 (10th Cir. 1988)).

Under this test, Plaintiffs' proposed class meets the typicality requirement.  Each named

Plaintiff claims that he or she was wrongfully terminated, either fired or constructively

discharged, as a result of exercising or trying to exercise the right to make worker's

compensation claims.  The affirmative claims of the putative class members would be no

different.

### D.    Adequacy of Representation

The adequacy of representation criterion requires that both the named Plaintiffs and their

attorneys "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This

requirement has two parts: (1) the named Plaintiffs' interest must not be antagonistic to the class

interests, and (2) the named Plaintiffs' attorneys must be qualified, experienced, and generally

capable of conducting the litigation.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626

n.20 (1997);  Ditty v. Check Rite, Ltd., 182 F.R.D. 639, 642 (D. Utah 1998).

La-Z-Boy does not dispute the credentials of Plaintiffs' attorneys or their ability to represent the class.  The court also finds that Plaintiffs' counsel has represented their clients ably and zealously in this litigation.  Accordingly, the adequacy of Plaintiffs' attorneys to serve as class counsel is not in doubt here.

Rather, La-Z-Boy asserts that the named Plaintiffs are inadequate to represent the class due to a conflict of interest.  Specifically, La-Z-Boy contends that by withdrawing their demand for compensatory damages in what La-Z-Boy views as an attempt to increase the chances of class certification under Rule 23(b)(2), the named Plaintiffs acted at odds with the interests of those putative class members who would like to pursue compensatory damages.  La-Z-Boy cites to several non-controlling cases that have held that this type of conflict of interest makes a named plaintiff inadequate and precludes class certification.  These cases reason that if a class is certified under Rule 23(b)(2), the putative class members could lose their right to opt out of the class.  If that happened, putative class members in an injunctive class would likely be barred by issue preclusion from bringing their compensatory action claim against a defendant, without regard to whether the certified class prevails on the injunctive relief.  In such a case, the named plaintiffs have essentially waived all of the putative class members' right to collect compensatory damages.

Plaintiffs counter that the court has discretion to allow opt outs of an injunctive class. They point to several federal appellate court decisions supporting this proposition.  La-Z-Boy responds that the Tenth Circuit has not made a ruling on this issue and argues that other district courts in this Circuit have ruled that there can be no opt out in injunctive classes.

Though not made with a high degree of certainty, the court's best guess is that the Tenth Circuit would allow district courts discretion to allow putative class members opt out of Rule

23(b)(2) classes in some circumstances.  A case like this, where the named Plaintiffs are willing

to forgo some damages to increase the chances of obtaining classwide injunctive relief, seems

like  a situation where such discretion should be exercised.  Accordingly, assuming that the

named class members have created a conflict of interest with some putative class members by

dropping their request for compensatory damages, the conflicted putative class members could

cure that conflict by opting out of an injunctive class.

Moreover, Plaintiffs have sought certification under Rule 23(b)(3) as an alternative to an

injunctive class.  If the court were to certify a damages class, there is no question that putative

class members who want to seek compensatory damages would have the right to opt out.

Accordingly, because it appears that the potential conflict among the putative class members

with regard to damages can be cured, the named Plaintiffs and their counsel meet the adequacy

prong of Rule 23(a).

**IV.**     **Requirements of Rule 23(b)**

Having decided that the Plaintiffs' proposed class meets the requirements for certification

of Rule 23(a), the court must determine whether the class qualifies under one of the categories of

Rule 23(b).  Plaintiffs primarily argue that their proposed class meets the requirements for

certification under Rule 23(b)(2).  In the alternative, Plaintiffs argue that this class could be

certified under Rule 23(b)(3).  For the reasons discussed below, the court believes that the

proposed class does not qualify under either Rule 23(b)(2) or Rule 23(b)(3).

**A.**     **Requirements of Rule 23(b)(2)**

To obtain certification of a class under Rule 23(b)(2), the class proponent must show that

"the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

27

the class as a whole." Fed. R. Civ. P. 23(b)(2).  In <u>Shook</u> II, the Tenth Circuit elaborated

extensively on the requirements of Rule 23(b)(2):

> By its terms, then, Rule 23(b)(2) imposes two independent but related requirements.  In the first place, the defendants' actions or inactions must be based on grounds generally applicable to all class members.  The second requirement is more restrictive . . . [and] requires that final injunctive relief be appropriate for the class as a whole.  The rule therefore authorizes an inquiry into the relationship between the class, its injuries, and the relief sought, and we have interpreted the rule to require that a class must be "amenable to uniform group remedies."  Put differently, Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries, the absence of which can preclude certification.
>
> This cohesiveness has at least two aspects.  First, the class must be sufficiently cohesive that any classwide injunctive relief can satisfy the limitations of Federal Rule Civil Procedure 65(d)- namely, the requirement that it "state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required."  Second, "[a] class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant."  So, if redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, "the suit could become unmanageable and little value would be gained in proceeding as a class action."  Indeed, it is precisely these types of manageability issues-relating to the district court's "ability to provide injunctive relief to the class framed in the complaint," a textually authorized consideration-that we held permissible in <u>Shook</u> I, [386 F.3d] at 973 ("Elements of manageability and efficiency are not categorically precluded in determining whether to certify a 23(b)(2) class.").  And individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction; as we have explained before, "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65."  In short, under Rule 23(b)(2) the class members' injuries must be sufficiently similar that they can be addressed in an single injunction that need not differentiate between class members.

<u>Shook</u> II, 543 F.3d at 604.

As noted, the Plaintiffs' Second Amended Complaint appears to seek an injunction

directing the Utah Labor Commission to review the worker's compensation files of each of the

class members.  Plaintiffs, however, have stated in their briefing that the injunction they actually

seek is an order directing La-Z-Boy to reevaluate each worker's compensation claim made by

each class member and pay any additional amounts owed the member or provide the medical

care needed.  (See Pls.' Reply in Support of Class Cert. at 35.)  Plaintiffs envision that disputes

about what additional money or medical care should be awarded to the class members would be

referred to the Utah Labor Commission.  (See id. at 35-36.)

Plaintiffs' proposed injunctive class is precluded under Shook II.  First, it is not enough

for Plaintiffs to generally assert that La-Z-Boy had an overarching practice of denying or

underpaying worker's compensation claims that applied to every putative class member equally.

Instead, to decide whether La-Z-Boy wrongly denied and/or underpaid worker's compensation

benefits, a fact finder would have to look into individual class members' circumstances to decide

whether any denials were justified and amounts paid were appropriate.  This review would be

fact-intensive and highly specific to each class member, as is illustrated by considering the

named Plaintiffs' cases.  For example, several named Plaintiffs such as Ms. Scott and Mr. Nelson

received lump sum partial disability payments.  In Ms. Scott's case, it is not clear how that

determination was made, but in Mr. Nelson's case, it is clear that there were competing opinions

by doctors on the level of his disability.  To determine which doctor was correct, the court would

need to review both doctors' opinions and would likely admit two medical expert opinions to

help it decide the issue.  The need for particularized reviews such as this that focus on the

appropriateness of relief to individual class members weighs heavily against certifying this

injunctive class.[3]

Moreover, an injunction ordering La-Z-Boy to "reevaluate" every worker's compensation

claim made by any class member would contain exactly the type of "stratospheric level of

---

[3] Even if the court were to agree with Plaintiffs that it was appropriate to decide whether La-Z-Boy had a generalized pattern of wrongful claims handling, there would need to be a review of at least some individual cases to make such a determination.  And if this review were limited to, for example, the claims of the named Plaintiffs, the fact and expert record involved would be still enormous and complicated.

abstraction" that <u>Shook</u> II warns against.  <u>See</u> <u>Shook</u> II, 543 F.3d at 604.  And once the court

begins to address the specifics that would apply to reevaluating a class member's claim, it

becomes clear that there is not enough cohesion in the putative class members' circumstances to

render injunctive relief appropriate here.  Indeed, questions relevant to individual cases abound.

For example, should La-Z-Boy be required to consider new claims that workers have not yet

made relating to injuries that they allege they suffered after leaving La-Z-Boy but are attributable

to working at La-Z-Boy?  What should happen in cases where La-Z-Boy and the putative class

member have a written settlement agreement regarding the payment of a worker's compensation

claim?  Should La-Z-Boy be required to disregard second opinions that the class member

believes were pretexts to avoid coverage?  Is La-Z-Boy barred from asserting that a class

member's previous claims had no merit?  What happens if private or public insurance has already

covered a procedure that La-Z-Boy should have paid for?  And so on.  Short of an injunction

ordering a blanket reversal of any denial and an upward adjustment of any payments made, the

court cannot conceive of a "one-size-fits-all" injunction that could apply here.  In short, an

injunctive class should not be certified where, as here, the relief must be tailored to fit the

circumstances.

　　　　Further, setting aside these issues, it is not clear that the issue of whether the putative

class members' worker's compensation claims were resolved correctly would have any bearing

on the cause of action asserted in the Second Amended Complaint.  That is, Plaintiffs assert that

they were wrongfully terminated for filing or attempting to file worker's compensation claims.

In six out of seven of the named Plaintiffs' cases, the termination was outright and not a

constructive discharge.  To prove their cause of action, these Plaintiffs would need to show that

they were fired as a result of filing or attempting to file a claim and that any contrary reason La-

Z-Boy offers for the firing, if any, is a pretext.  The question of whether their worker's

compensation claims were processed correctly would at most be a background fact in that

situation, if relevant at all.  For the other named Plaintiff, Mr. Ross, it could be said that the

alleged mishandling of his worker's compensation claims was one of the factors making

conditions intolerable enough for him to feel compelled to leave La-Z-Boy.  But Mr. Ross would

probably not have to prove that his claims were wrongly decided to show that claims handling

contributed to his decision to leave La-Z-Boy.

 In other words, given the nature of their claim against La-Z-Boy, there is no reason that

any of the named Plaintiffs or other putative class members would have to prove that their

worker's compensation claims were incorrectly decided.  In this light, hearing evidence from

class members about the merits of their worker's compensation claims would likely add

unneeded complexity at any trial involving a certified class.  This too militates against

certification of Plaintiff's proposed class under Rule 23(b)(2).

 Finally, and significantly, the money damages that the named Plaintiffs seek are

substantial.  The court finds persuasive the district court's observation in <u>Clark v. State Farm</u>

<u>Mut. Auto. Ins. Co.</u>, 245 F.R.D. 478 (D. Colo. 2007) that:

> Where the amount of damages available to each individual plaintiff is high, the presumed
> cohesiveness and homogeneity among class members that underlies the Rule 23(b)(2)
> class is less that certain. Simply put, the more each plaintiff has to lose, the less likely he
> will be to put his faith in the class: "as claims for individually based money damages
> begin to predominate, the presumption of cohesiveness decreases while the need for
> enhanced procedural safeguards to protect the individual rights of class members
> increases, thereby making class certification under (b)(2) less appropriate."

<u>Id.</u> at 486 (citation omitted).[4]  Further, an injunctive class should not be certified when "the relief

_____

 [4] Plaintiffs correctly note that <u>Clark</u> based its reasoning on the assumption that Rule
23(b)(2) does not allow for opt outs.  But <u>Clark</u>'s logic applies even assuming an opt out right for
injunctive class members.  That is, a putative class whose members have high value money

sought [i]s primarily monetary damages."  <u>Monreal v. Potter</u>, 367 F.3d 1224, 1236 (10th Cir. 2004).

Here, the named Plaintiffs' lost wages and benefit claims are each alleged to amount to hundreds of thousands of dollars.  Specifically, an expert retained by Plaintiffs calculates Mr. Ammons's claim for lost wages and benefits to be worth $330,654, Mr. Barela's claim to be worth $300,478, Mr. Nelson's claim to be worth $192,130, Mr. Peterson's claim to be worth $420,712, Mr. Ross' claim to be worth $395,176 amd Ms. Scott's claim to be worth $251,702. (<u>See</u> Dkt. No. 273-3.)  A calculation of the value of Mr. Garcia's claim was not provided, though it seems likely to be commensurate with that of the other named Plaintiffs.  Notably, Plaintiffs' expert limited his valuation only to lost earnings, lost employee benefits, and prejudgment interest.  If the amount of compensatory damages were considered, these amounts would surely be higher.  The asserted high value of the named Plaintiffs' claims weighs against certifying an injunctive class here.

Moreover, money damages appear to be the primary relief Plaintiffs seek.  Indeed, money damages is the only remedy that would certainly be awarded (or at least certainly be considered) if a putative class member proves a claim of wrongful discharge.  What's more, it does not appear that all of the putative class members would necessarily benefit from the proposed injunction even if it did issue.  For example, Ms. Scott already had her back surgery paid for by Medicaid.  It is unclear what benefit she would receive from an injunction requiring that La-Z-Boy reconsider paying her for the same back surgery now.  But Ms. Scott and other putative class members like her would certainly benefit from an award of money damages for lost

---

claims is less cohesive and homogenous than one where the money damages available are minimal or non-existent.

earnings, lost employee benefits and prejudgment interest.

Given all of these considerations, the court finds that the Plaintiffs' proposed class should not be certified under Rule 23(b)(2).  This conclusion does not end the certification analysis, however, as Plaintiffs alternatively seek to certify under Rule 23(b)(3).

> **B.**     **Requirements of Rule 23(b)(3)**

"Class actions under (b)(3) must have 'questions of law or fact common to the members of the class [that] predominate over any questions affecting only individual members' and must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  Monreal, 367 F.3d at 1236-37.  The predominance criterion of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a).  Id. at 1237 (quoting Amchem, 521 U.S. at 623-24).

There is little question here that individual questions will predominate over common questions in resolving the putative class members' claims of wrongful discharge.  Without a doubt, some issues will be subject to common proof.  For example, La-Z-Boy's worker's compensation costs and its incentive to cut those costs will be common to the class.  But the core issues of liability to each class member will require individual proof that will vary from class member to class member.

This conclusion becomes apparent when reviewing what a plaintiff must show to prevail on a claim of wrongful termination based on filing a worker's compensation claim.  Specifically, a plaintiff must show:

> (I) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected.

Touchard, 148 P.3d at 955 (quoting Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 404 (Utah

1998)).  In this case, while the second prong of this test will not involve any individual fact inquiries to resolve, the first and third prongs will sometimes require such inquiries and the fourth prong will always require such inquiries.

The facts surrounding the named Plaintiffs' cases illustrates this point.  For example, Mr. Ammons alleges that he was set to file a worker's compensation claim the day he was fired, and that La-Z-Boy knew that he was going to do so.  This means that Mr. Ammons will have to present potentially disputed proof on the third prong.  That is, a jury would have to determine whether Mr. Ammons' unrealized intention to file a claim was conduct bringing into play the policy of protecting those who exercise rights under worker's compensation.  He will also have to offer evidence on the fourth prong, that is, whether La-Z-Boy fired him because he was going to file a claim.  In Mr. Ross' case, he will have to put on individualized evidence on the first prong.  That is, did La-Z-Boy's actions against him amount to a constructive discharge?  And if he was constructively discharged, was it because he filed worker's compensation claims?  For Plaintiffs like Mr. Garcia, no individualized evidence would be needed with the exception of the fourth prong.  That is, it is clear that Mr. Garcia was terminated and that he filed a worker's compensation claim.  But Mr. Garcia must still make a showing on the issue of whether the allegation that he falsified time cards was the actual reason that La-Z-Boy fired him, or if the allegation was a pretext to fire him because he filed worker's compensation claims.

In each of these cases, the named Plaintiff will have to provide individual evidence regarding one or more of the elements of his claim and La-Z-Boy will most likely offer contrary evidence.  This conclusion will hold true for each of the putative class members.  Notably, making these determinations will be complicated in light of the unfortunate fact that debilitating injuries can effect on a worker's ability to perform his or her job, which likely affected La-Z-

34

Boy's decision making as well.  How this fact should be weighed will vary from worker to worker.

Plaintiffs argue that the individual inquiries identified above do not preclude class certification here because this case can proceed using the "pattern or practice" procedure.  In that type of case, the court first has proceedings to determine whether a defendant engaged in a discriminatory "pattern or practice" and then deals with any individualized issues relating to the putative class members, such as affirmative defenses and damages, in a later phase.  La-Z-Boy responds that this case does not qualify for treatment as a "pattern and practice" case.

The court has exhaustively reviewed various authorities on "pattern and practice" and concludes that this is not a case where the that type of procedure is appropriate.  First, the "pattern and practice" framework was developed in the context of federal discrimination statutory class actions.  Under some of those statutes, a pattern or practice of discrimination itself is harm meriting injunctive relief to a class of similarly situated employees.  The court hesitates to apply this concept to this state common law cause of action in the context of Rule 23, where the harm is the loss of a job.  This conclusion is strengthened because the claim involved here is a brand new one, and was in fact first recognized by the Utah Supreme Court in this very case.

In sum, because individual proof for each class member will be required to show liability, common issues of fact and law do not predominate here.  Accordingly, class certification is denied under Rule 23(b)(3).

## V.    La-Z-Boy's Motions to Sever

For the same reasons that this case is not suited for class certification, the claims of the named Plaintiffs should be severed pursuant to Federal Rule of Civil Procedure 21.  That is, each named Plaintiff's case will require particularized evidence, such that attempting to try their cases

35

together will cause delay and prejudice to all of the parties.  Consequently, the claims of the seven named Plaintiffs will be divided into seven actions and tried separately.

Splitting this case into separate actions will raise various logistical issues.  These issues include the filing of amended complaints by the named Plaintiffs, the filing of any new complaints by unnamed putative class members, potentially consolidating these actions for discovery purposes, scheduling questions, and so on.  The court would like the input of counsel to address these issues to encourage a more efficient resolution of them.

Accordingly, a status conference will be held on January 21, 2009 at 1:00 p.m. for the court to hear the parties on these logistical issues.  Counsel for the parties are instructed to meet and confer by January 14, 2009 to create a joint agenda for the status conference and to identify items on which the parties agree and items on which they disagree.  This agenda should include the issues mentioned above, as well as any other issues the parties believe the court should consider.  The parties must file the agenda by January 16, 2009.

## ORDER

For the reasons stated above, the court ORDERS as follows:

La-Z-Boy's Motions to Sever (Dkt. Nos. 70 & 163) are GRANTED;

Plaintiffs' Motion to Certify Class (Dkt. No 164) is DENIED;

La-Z-Boy's Motions to Strike (Dkt. Nos. 228 & 231) are DENIED;

Plaintiffs' Motion to Strike (Dkt. No. 263) is DENIED; and

La-Z-Boy's Motion to Supplement (Dkt. No 271) is GRANTED.

SO ORDERED this 5th day of December, 2008.

BY THE COURT

TENA CAMPBELL
Chief District Judge